1

1                 UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF FLORIDA
2                    JACKSONVILLE DIVISION

3    JAC'QUANN MARQUIS HARVARD,

4         Plaintiff,
                                        CASE NO.:
5    vs.                          3:19cv-1147-J-20 PDB

6    W. BLITCH, et al.,

7         Defendants.

8    _____/

9

10             VIDEO-RECORDED DEPOSITION OF:

11                    KATRINA SECK

12           Taken on Behalf of PLAINTIFF

13

14        DATE:        March 8, 2022

15        TIME:        12:35 p.m. – 1:43 p.m.

16        PLACE:       Via Zoom Video-Conference

17        REPORTED BY:   Deborah Alff, RPR

18

19           For the Record Reporting, Inc.
             1500 Mahan Drive, Suite 140
20           Tallahassee, Florida  32308

21

22

23

24

25

2

1    APPEARANCES OF COUNSEL (Via Video-Conference):

2    On behalf of the PLAINTIFF:

3         JAMES VERNON COOK, ESQUIRE
          Law Office of James Cook
4         314 West Jefferson Street
          Tallahassee, Florida  32301-1608
5         Phone:  850-455-2332
          E-mail:  CookJV@gmail.com
6
     On behalf of the DEFENDANTS:
7
          SHIRLEY WILSON DURHAM, ESQUIRE
8         Office of the Attorney General
          The Capitol, PL-01
9         Tallahassee, Florida  32399-1050
          Phone:  850-414-3300
10        E-mail:  Shirley.Durham@myfloridalegal.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          INDEX TO WITNESS

2                                                        PAGE

3    KATRINA SECK

4        Direct Examination by MR. COOK                   5

5    Certificate of Reporter                             41

6

7

8

9                          - - - - -

10                      E X H I B I T S

11                          (NONE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1              P R O C E E D I N G S

2          COURT REPORTER:  The time is 12:35 and we're

3      going on the record.  This is the video-recorded

4      deposition of Katrina Seck taken on Tuesday, March

5      8, 2022 in the case of Jac'Quann Marquis Harvard

6      vs. W. Blitch, et al., case number

7      3:19-cv-1147-J-20PDB, in the U.S. District Court,

8      Middle District of Florida, Jacksonville Division.

9          I am the court reporter, Deborah Alff.  The

10     attorneys participating in this proceeding

11     acknowledge I am not physically present with the

12     witness and I will be reporting this remotely.

13     They further acknowledge that, in lieu of an oath

14     administered in person, the witness will verbally

15     declare her testimony under the penalty of perjury.

16     The parties and their counsel consent to this

17     arrangement and waive objections.  Please, Counsel,

18     indicate your agreement by stating your name and

19     agreement on the record.

20          MR. COOK:  James Cook, I agree.

21          MS. DURHAM:  Shirley Durham, I agree.

22          COURT REPORTER:  And will the witness please

23     say your full, legal name into the record.

24          THE WITNESS:  Katrina L. Seck.

25          COURT REPORTER:  And will the witness please

5

1      repeat the following declaration:  I declare my

2      testimony is given under the penalty of perjury.

3            THE WITNESS:  Can you repeat that, sorry?

4            COURT REPORTER:  Yes, ma'am:  I declare my

5      testimony is given under the penalty of perjury.

6            THE WITNESS:  I declare my testimony is given

7      under the penalty of perjury.

8            COURT REPORTER:  Thank you.  Counsel, please

9      proceed.

10           MR. COOK:  Thank you.

11  Whereupon,

12                     KATRINA SECK,

13     Called as a witness, herein testified as follows:

14                  DIRECT EXAMINATION

15  BY MR. COOK:

16     Q.   Okay.  I have asked for you or someone to

17  answer questions relating to the redaction of discovery

18  documents including complaints and disciplinary records.

19  And to start with, well, let me ask you, are you an FDC

20  employee?

21     A.   Yes, I am.

22     Q.   Okay.  And when did you start with FDC?

23     A.   I started in December 24, 2014 as an OPS

24  employee.  I left for a few months to another position

25  at the governor's office and came back in September of

6

1   2016.

2        Q.   Okay.  And when you started in 2016, were you

3   OPS or a regular employee?

4        A.   I was a regular full-time employee.

5        Q.   Okay.  Now, as an OPS employee, what were your

6   duties?

7        A.   Originally, to submit data entry into the

8   system for use of force records that we received in the

9   office, and shortly after I learned to process public

10  records requests and make redactions.

11       Q.   Okay.  Now, what kind of training did you get

12  for redacting documents?

13       A.   From the staff in the Inspector General's

14  office and Office of General Counsel, specifically our

15  legal advisor for the Inspector General's office, our

16  attorney.

17       Q.   Okay.  And who's that?

18       A.   That was Elissa Saavedra at the time.

19       Q.   Okay.  And now it's changed to another person?

20       A.   Yes, we have had several different legal

21  advisers in the IG's office over the course that I've

22  been here.

23       Q.   So, Elissa, Elissa Saavedra was an attorney in

24  the OIG office?

25       A.   She was in the General Counsel's office.

7

1    However, she specifically provided legal advice as for

2    our office in the IG's office.

3        Q.    Okay.  So are you assigned now to the IG's

4    office?

5        A.    Yes, sir.

6        Q.    Okay.  And I guess that's because most

7    requests for information are regarding uses of force, is

8    that correct?

9        A.    It varies, but, yes, we do get a lot of uses

10    of force inquiries.

11        Q.    Okay.  So you would get the inquiries whether

12    they involved uses of force or not?

13        A.    Yes.  Any, any requests for Inspector General

14    records.

15        Q.    Okay.  Now, if it was a request for

16    classification records, those wouldn't go to you, would

17    it, would they?

18        A.    No, they would not.

19        Q.    So if they're IG's office records, then I

20    suppose that they would be use of force or investigation

21    records?

22        A.    That's correct.

23        Q.    Okay.

24        A.    Our, our main records are the use of force and

25    in investigations or news.

8

1      Q.   Okay.  And if then they were medical records,
2  they would come from somebody else?
3      A.   Yes.  A specific request for medical records
4  would come from a different office.
5      Q.   Okay.  So when you had training in how to
6  redact records, was that formal training, like classroom
7  style?
8      A.   It was not classroom style.  It was pretty
9  much one-on-one training.
10      Q.   Okay.  So --
11      A.   With Ms. Saavedra.
12      Q.   So if you had a specific question, something
13  you had never seen before, you would go to Ms. Saavedra?
14      A.   Yes.
15      Q.   Okay.  Now, when you got a request for
16  records, did it make a difference whether it was from
17  a -- for purposes of public records disclosure or legal
18  discovery?
19      A.   Not necessarily.  There wouldn't be a
20  difference in how we process the requests.  Redacting
21  can be a little different sometimes, but that's when
22  we're advised by our General Counsel's office, is there
23  any certain way we would need to redact these records.
24      Q.   Now, you have, you have documents, don't you,
25  that tell you what to redact?

9

1          A.    Yes.   We have our invoice for production of

2    records, for public records and for a subpoena

3    checklist.   The DC1-201 and DC1-205.   That's got a list

4    of exemptions that are commonly used in our agency that

5    we would check off and redact.

6          Q.    Okay.   Do you have anything, any sort of list

7    that is specifically for discovery?

8          A.    No, sir, not that I'm aware of.

9          Q.    Okay.   I say that because we're doing

10   discovery in federal court, and the state laws regarding

11   release of information do not apply.   However, we have a

12   document that we've worked out with the Department that

13   says that if we get these records, that we won't

14   broadcast them, but hold them close.

15         A.    Mm-hmm.

16         Q.    Only share them with certain enumerated

17   people.   Do you, when you get a discovery request, are

18   you aware that it's a discovery request?

19         A.    The majority of the time, we are aware that

20   it's a discovery request.

21         Q.    Okay.   Okay.   I'm going to ask you some

22   specific questions about redaction.   We are looking at,

23   at personnel records that include disciplinary records

24   involving people who -- whose rights were deemed to be

25   violated, so that the officer who did it actually

1   received discipline for that.  Would there be any reason

2   that you know of, to redact the name of the person who

3   was, who was abused?

4        A.   For example, an inmate?

5        Q.   Yes.

6        A.   Yes.  A couple different reasons there could

7   be as to why an inmate name would be redacted who was

8   abused.  Number one, information regarding the victim's

9   statement and identity.

10       Q.   Okay.

11       A.   That's a common exemption that we could use in

12  the information regarding the victim of a crime.  And

13  any alleged sexual harassment or sexual abuse victims of

14  inmates.

15       Q.   Mm-hmm.  Okay.  So do you automatically assume

16  that an abuse complaint involves a crime?

17       A.   No, we -- we look further into it in our

18  office to see if they were a victim of a crime.

19       Q.   Okay.  So would a use of excessive force be

20  considered a crime?

21       A.   If, if there was a criminal investigation

22  related to it, yes --

23       Q.   Okay.

24       A.   -- that was closed by arrest or exceptionally

25  cleared.  We take Marsy's Law into consideration as

1  well.

2      Q.   Okay.  What does "exceptionally cleared" mean?

3      A.   That the State's Attorney's office declined to

4  prosecute is mainly the reason that we see for

5  exceptionally cleared.

6      Q.   Okay.  What would be the reason for redaction

7  of the deployment of chemical agents?

8      A.   The redaction for the deployment of chemical

9  agents?

10     Q.   Mm-hmm.

11     A.   Off the top of my head, I'm not thinking of

12 any specific reason of the action that chemical agents

13 were used, why that would be redacted.

14     Q.   In a little bit, I'm going to show you some

15 examples, but I just wanted to ask the question

16 generally to start.

17     A.   Mm-hmm.

18     Q.   There is a little code in the top left-hand

19 corner of every MINS report that's redacted.  Do you

20 know what that's about?

21     A.   Yes.  That's one of our screens that we use in

22 our, our database.  And that is redacted so that it's

23 not -- uh, our system, in case that it was compromised,

24 could not easily access into our records.  And that's

25 just one screen in the MINS that is used that we redact.

12

1        Q.   Okay.  And you mean to say that the code in

2   the top left-hand corner is a code that could be used to

3   enter your system?

4        A.   To enter specific records in our system, yes.

5        Q.   Oh, I see.

6        A.   Mm-hmm.

7        Q.   So if someone has that code, that they can

8   enter records in the system?

9        A.   Correct.

10       Q.   Okay.  But, but there are a number of screens

11   and not every screen, that that code on the top

12   left-hand corner is not problematic in every screen, is

13   that it?

14       A.   No.  Any codes in that, in that OBIS system

15   that's used would, should be redacted.

16       Q.   Mm-hmm.  I see that the code of the person has

17   a numerical value of some kind that precedes the name of

18   the person who enters it.  That is also generally

19   redacted.

20       A.   Mm-hmm.

21       Q.   What is the purpose of that?

22       A.   That would be the same reasoning as if

23   their -- their ID was compromised and entering in the

24   information.  If our system was compromised, then we

25   wouldn't want that user name to be used or known, so

1    that it's just an addition, additional protection of our

2    system.

3        Q.   Isn't there some better way to deal with that?

4    I've never seen that many documents where a code next to

5    a name or at the top of a document is an entry key to

6    the system itself.

7        A.   I'm not aware of any way that it can be

8    removed from the way that our -- our system prints those

9    records.

10       Q.   Okay.  It's a very old system, isn't it?

11       A.   To my knowledge, yes.

12       Q.   Okay.  Before Microsoft entered the field and

13   created the modern PC, with the old DOS system, right?

14       A.   I am not too sure.

15       Q.   Okay.  Well, I lived during those days and so

16   I know when the big change happened.  Okay.  Also, why

17   are the ID numbers of FDC staff redacted?

18       A.   Sometimes, under that ID column in a MINS

19   report will be a social security number.  If an actual

20   employee ID number is redacted, it could be that, you

21   know, they're protecting the identity of that person

22   whose ID is redacted.

23       Q.   Well, we have got their name.

24       A.   You've got the name?

25            I'm not sure why that would be redacted.  It

14

1    could be that another office redacted.  And I'm not sure

2    of the exemption they would have thought to apply to

3    that.

4         Q.   Okay.  Well, I'm going to do a share screen.

5    Do you -- the device that you're watching this on, is

6    that a -- is that a tiny screen or do you have a decent

7    size screen?

8         A.   It's fairly small.  I'm on a small laptop.

9         Q.   Sure.  Okay.  But it's not your iPhone?

10        A.   No, no iPhone.

11        Q.   Okay.  All right.  Okay.  I'm going to share

12   screen now so that you can see what I'm looking at.  And

13   the first thing I'm going to pull up is what I've got as

14   a -- I'm going to make it as big as possible.

15        A.   Mm-hmm.  I can see that.

16        Q.   Have you seen this document before?

17        A.   Yes, I have.

18        Q.   Okay.  And the certain things, post charts,

19   master security rosters, are excluded apparently under

20   the public records exemptions --

21        A.   Mm-hmm.

22        Q.   -- of (3)(a) and (2)(d) which I'll get to in a

23   little bit.

24        A.   Mm-hmm.

25        Q.   And the other thing that I see in here is

15

1   945.10(1)(e).  Are you familiar with that?

2        A.   The (e), I don't know if that's information

3   which if released would jeopardize a person's safety,

4   but I can check on my --

5        Q.   No, that's what it is.  You're correct.

6        A.   Okay.

7        Q.   That seems so broad.  If somebody did a very

8   bad thing to someone that was unjustified and totally,

9   totally wrong, essentially that says that you can redact

10  it out of a record, hide it from the public.  What, do

11  you have any more guidance for that, the use of that

12  section?

13       A.   More so experience with that exemption.  It is

14  very discretionary, in my opinion.

15       Q.   Mm-hmm.

16       A.   And there's not much out there written about

17  this statute.  So in the IG's office we -- we really try

18  to have a very, um, open view to this exemption where

19  if, if, say, an officer is arrested for introducing

20  contraband, and we have an inmate who's provided very

21  good information --

22       Q.   Mm-hmm.

23       A.   -- about this officer bringing in contraband,

24  we would redact that inmate's name or information that

25  they have provided to protect them.

16

1       Q.   Isn't there another statute that protects
2  confidential informants?
3       A.   There is, however, I have been told that we do
4  not have confidential, per se, informants in our agency.
5       Q.   I see.  Okay.  I'm going to put up Chapter
6  119.071 and the -- do you see that?
7       A.   Yes.
8       Q.   Okay.  Yeah.  119.071, exemptions from
9  inspection or copying of public records.  Of course, our
10 position is that doesn't apply to us, but I just wanted
11 to, to the extent that it might be used, I just wanted
12 to go over it.
13           So (2)(d) involves surveillance techniques or
14 procedures for any comprehensive inventory of resources
15 involved in responding to an emergency.  The list of the
16 roster mentioned, it's just a list of officers working
17 day to day, and in housing areas and you know, chow hall
18 and -- and yard duty and things like that.  Why would
19 that, if you've been told, if it's been explained to
20 you, why would that section keep a public record from
21 including a list of people who worked on a certain day
22 at a certain institution?
23       A.   I haven't been told specifically.  However, my
24 best guess would be that it's pertaining to surveillance
25 techniques in that dormitory.

OR THE RECORD REPORTING TALLAHASSEE FLORIDA  850.222.5491

1      Q.   Well, surveillance tech, you mean security

2  checks, looking in the windows of the inmates?

3      A.   Yes, security checks and times.  Any knowing,

4  you know, which officers are on certain shifts during

5  the day and what they're responsible for monitoring.

6      Q.   Well, if they're not responsible for security

7  or for surveillance, then why would the whole document

8  be -- be exempted from public records?

9      A.   I can't answer that with certainty, but again,

10  my best guess would be that any corrections officer is

11  considered security.

12      Q.   Wow, that's a big field.  If we applied that

13  to police officers then we wouldn't have -- our

14  newspapers could be half as long.  Okay.  But you don't

15  know any other reason, then, that it might be involved

16  in surveillance?

17      A.   I am just thinking that it would be the

18  knowing the location of that officer at a specific time

19  and which dormitory they're assigned to.

20      Q.   Right.  It's in the past, it's not something

21  that's happening in the future, right?

22      A.   It's not something happening in the future,

23  but it could be reoccurring.

24      Q.   Okay.  So let's see.  (3)(a) is also used for

25  the same documents, security and fire safety.  All

OR THE RECORD REPORTING TALLAHASSEE FLORIDA  850.222.5491

1   right.  Records, information, photographs, audio, et

2   cetera, et cetera, relating directly to physical

3   security or fire safety of the facility.

4               So is the idea that anybody who is working at

5   a prison is -- that the fact that they're working there

6   relates directly to the physical security of the

7   facility?

8        A.   Yes, with an added step of which dormitory

9   they would be assigned to, I would say.

10       Q.   Okay.  Does that have to do with whether it's

11  confinement or general population?

12       A.   No, sir.

13       Q.   What would be the depending factor?

14       A.   Just knowing which days and shifts they are

15  working.

16       Q.   Oh, oh, oh.

17       A.   Yeah.

18       Q.   The fact that you would know that such and

19  such an officer worked in housing area D on a particular

20  day?

21       A.   Yes.

22       Q.   Sometimes, I see logs where the only thing

23  redacted out is the dorm number or letter and the time

24  of the security checks.  Is that also sometimes a way of

25  dealing with that?

19

1      A.   It could be.   From information I have would --
2  would be that they're reviewing this, this cell and this
3  dorm at this time, and could compromise security of an
4  institution.

5      Q.   Sure.   But, in the context of discovery, where
6  that officer was at a certain time might be material
7  evidence, might it not?

8      A.   It could, yes.

9      Q.   Okay.   So would you say that that should not
10 apply to discovery?

11          MS. DURHAM:   I'm going to object to the form.

12          MR. COOK:   Go ahead.

13          THE WITNESS:   I'm not sure.

14 BY MR. COOK:

15     Q.   Okay.   That's not a topic that has ever come
16 up between you and your legal advisor?

17     A.   Not regarding security.   We really check with
18 the -- the attorney that's dealing with the -- the
19 discovery and litigation case.

20     Q.   Okay.

21     A.   And our General Counsel's office.   And usually
22 all security information would either be redacted or not
23 be redacted.

24     Q.   Okay.   So when you say you consult with the
25 attorney, you're talking about the attorney assigned to

1   the case in the General Counsel's office, correct?

2        A.   Yes.

3        Q.   Okay.  Not necessarily the attorney who's

4   representing the defendants in the case?

5        A.   Correct.

6        Q.   Okay.  And so they would give you guidance on

7   whether and to what extent to redact that kind of

8   information?

9        A.   That's correct.

10       Q.   Okay.  But you know there's a difference,

11  right?

12       A.   Yes.  Mm-hmm.

13       Q.   Okay.  All right.  Let me put up, let me put

14  up 945.10.  We discussed that briefly.

15       A.   Mm-hmm.

16       Q.   And as you remembered, it was information

17  which if released would jeopardize a person's safety.

18  And I think that you said that that was an area where

19  discretion was applied and was based on the facts of the

20  context in which the information appears.  Is that a

21  fair assessment?

22       A.   Yes.

23       Q.   Okay.  And if I recall correctly, you also

24  said that that was a tough one?

25       A.    It can be tough at times as it's -- as it

21

1    being so discretionary, you have to use your best

2    judgment.

3         Q.   Okay.  Then the next thing that we have is the

4    Florida Constitution.  You know, don't you, that Florida

5    was a leader in open government, open records and open

6    meetings?

7         A.   Yes.

8         Q.   Okay.

9         A.   I wasn't, I wasn't very aware, but I do know

10   that we are the top of the leaders of the open

11   government --

12        Q.   Yeah.  Were.  I have seen the exemptions in

13   Florida grow from being like two pages to being, you

14   know, dozens of pages.  So we may not be, our Sunshine

15   Law may not be the sunniest in the nation anymore.

16             But, anyway, so I guess you know that section

17   24 of our -- the amendments to our Constitution, I think

18   I just probably scrolled right past it -- is what

19   basically gives us the right as citizens to look at

20   government documents?

21        A.   Yes.

22        Q.   And so I guess it's probably not even worth

23   our time to put that up there.  It just says that we

24   have the right to look at records except for when we

25   can't.

22

1       A.    Mm-hmm.

2       Q.    So I'll just take that out and take these out

3   and get to my main point, which is, the kinds of

4   redactions that we have gotten that we have questions

5   about.

6       A.    Okay.

7       Q.    Let me do this.   Okay.   Here's a case where we

8   have an officer who gave the names of certain people as

9   being neighbors, being people who know and that he has

10  contact with.   And so these neighbors are listed, but

11  then their addresses and phone numbers are redacted.   Do

12  you know why that would be done?

13      A.    I would think that it's so that the address

14  could not be identified of the officer or the applicant

15  could not be identified by -- by his neighbors'

16  addresses.

17      Q.    I see.   So you don't give the neighbors'

18  addresses because that would clue you in that he lives

19  somewhere around there?

20      A.    Yes.

21      Q.    Let me ask you this.

22            UNIDENTIFIED VOICE:   Sorry, I'm still not sure

23      about that.

24            MR. COOK:   I'm sorry, my Siri is talking to

25      me.   Never ask a question with your iPad open.

OR THE RECORD REPORTING TALLAHASSEE FLORIDA   850.222.5491

1  BY MR. COOK:

2      Q.   So let me ask you this.  Has your legal

3  advisor ever told you that these restrictions should be

4  narrowly drawn?

5      A.   No.

6      Q.   Okay.  So, so it's not just the officer's

7  address and phone number, but the addresses of people

8  who live in the same neighborhood, that's kind of a

9  leap, isn't it?

10     A.   It can be considered maybe by some, but, um,

11 I don't.  That is something that I would want to

12 protect.

13     Q.   Okay.

14     A.   If an officer is listing their neighbors and

15 they've got an exempt address that we can't provide

16 for -- for employees of this agency --

17     Q.   Mm-hmm.

18     A.   -- I think it's definitely sufficient to

19 redact neighbors' addresses, as well.

20     Q.   Okay.  And if you were suing someone who had

21 two pit bulls that killed a neighbor, do you think that

22 you might want to talk to those neighbors?

23     A.   I would.

24     Q.   Okay.  So I guess it's a balancing thing?

25     A.   Yes, it can be, but, but this is more

1   stringent and you know, we have got officers,

2   correctional officers who their addresses and dates of

3   birth and phone numbers are exempt.

4       Q.   Mm-hmm.  Understood.

5       A.   Mm-hmm.

6       Q.   But there would -- there's nothing else that

7   you can think of that would justify redacting the

8   neighbors' addresses other than concern for the location

9   of the officer himself, is that fair?

10      A.   That's fair, yes.

11      Q.   Okay.  Now, I have a use of force log here.

12  And I understand about the last four digits of social

13  security, but do you have any idea what these redactions

14  could be?

15      A.   I'm -- I'm just taking a moment to review.

16      Q.   Some of the things that we have seen redacted

17  relate to the use of chemical agents, and then we've

18  also seen redactions of names of people on whom force

19  has been used.  It doesn't bring anything to mind?

20      A.   It's not bringing anything to mind, no.

21      Q.   Okay.  This is going to happen throughout.

22  Here is a thing where we've got the name, but again

23  we've got something blacked out before the name.  Any

24  idea what that could be?

25      A.   No.  I can't think of what that would be.

1          Q.    What kind of information is typically -- so

2     here's a whole list of people.   What kind of information

3     would typically be in a use of force log that wouldn't

4     be open to public knowledge?

5          A.    I am not aware, um, because these logs are

6     generally kept in the personnel file, to my knowledge.

7          Q.    Mm-hmm.   Are you requested to provide

8     personnel file records?

9          A.    Not in the IG's office.

10         Q.    Oh, I see.   Okay.   So these would be if -- if

11    we asked for personnel records, they would be coming

12    from different sources, not from you?

13         A.    Correct.

14         Q.    Okay.   So you've never been trained in how to

15    deal with personnel records?

16         A.    We just simply use the 119, Chapter 119

17    exemptions for redactions.   Sometimes, you know, in our

18    investigations we come across personnel documents that

19    have been pulled, you know, from an individual's

20    personnel file and placed into our investigation because

21    it may have something to do with what is being

22    investigated.   But I -- I am not exactly positive what's

23    always on a use of force log except what would be listed

24    in those columns.

25         Q.    Okay.   Well, now, presently we're going to

26

1    have some discipline records and I imagine those are

2    things that you've seen your share of?

3         A.    A few, yes.

4         Q.    Okay.  So here is a probationary status

5    suspension letter.

6         A.    Mm-hmm.

7         Q.    And in addition to the home address, which I

8    can understand, there's something redacted from a

9    narrative that bears on exactly what we're looking for,

10   that says that he has a 12-hour suspension.

11   Specifically, on July 22, 2019, you failed to intervene

12   to stop a blank, blank, blank, after the inmate said he

13   was ready to cuff up.

14              Now, our client claims that Mr. Tomlin

15   (phonetic) used force on her after she agreed to cuff

16   up, and we'd like to know what that blank spot is.  Do

17   you have any idea what it could be?

18        A.    I don't have any, any positive idea, but it

19   seems like it would reference a use of force of some

20   kind.

21        Q.    Okay.  Yeah, and I know it does, but why would

22   a use of force be redacted in that context?

23        A.    I don't know why somebody would redact that

24   information.  Looking at the records here, if, if it is

25   in fact information saying to stop a physical or

1   chemical use of force, I would, I would not redact that.

2        Q.   Okay.  Now, here is a document relating to the

3   same incident that sheds more light.  Let's see.  Again

4   we have the name of the inmate redacted.  Is that due to

5   the concerns that there might be a criminal issue?

6        A.   Yes.

7        Q.   Okay.  And so that could be the reason that we

8   don't have the name of the inmate wherever it occurs?

9        A.   That could be and -- and now thinking back to

10  the disciplinary, the previous page we were on?

11       Q.   Mm-hmm.

12       A.   At that time, the only thing I can think of is

13  that maybe the criminal case -- or if there is a

14  criminal case -- was open at the time and they were

15  redacting any information regarding that act of criminal

16  investigation.

17       Q.   Okay.  But I'm sure this redaction happened

18  when I requested the record which is years later.

19       A.   Okay.

20       Q.   It says during review of the handheld video,

21  it was noted after the something, something, something,

22  inmate-somebody appears to be complying with all orders

23  to cease his disorderly behavior.  Inmate-something can

24  only be heard stating that he had, um, upon the arrival

25  of Lieutenant Homer Scott prior to inmate-blank can be

1  heard saying I'm ready to cuff up.  Lieutenant Scott

2  failed to address his statement or offer him the

3  opportunity to submit to restraints, and ordered the

4  cell door to be opened for blank.

5        Would you have redacted the narrative like

6  that?

7        A.   It's hard to say as I don't know what's

8  underneath those redactions.

9        Q.   You can imagine how hard it is to -- to

10  litigate a case when evidence like this is being

11  covered up?

12        A.   Mm-hmm.

13        MS. DURHAM:  Object to form.

14  BY MR. COOK:

15        Q.   Okay.  I didn't say this to you, but, from

16  time to time she may make objections to a question.

17  That's just for the court, not for you.  You should

18  still make best efforts to truthfully and fully answer

19  the question.

20        A.   Yes, sir.

21        Q.   Do you know what DART is?

22        A.   DART, a disciplinary action review team.

23        Q.   Okay.  And so they are people who look at uses

24  of force to see whether they violate discipline?

25        A.   Yes.

29

1    Q.   Okay.  DART recommended a 12-hour suspension.
2  It doesn't look like they're recommending prosecution.
3  If this isn't redacted based on an active criminal
4  investigation, can you think of any reason to redact all
5  of that information?
6    A.   I could not.
7    Q.   Now, here is, I believe that this is the same.
8  Yeah, this is the same incident.  Here there is so much
9  redaction done that you really can't make sense of the
10 document.  Although this is an incident report, a use of
11 force incident report which typically we get unredacted.
12 Let's see.  Again we have the inmate's name, and you
13 have said that could conceivably have to do with whether
14 that person was a victim of a crime?
15   A.   Yes.
16   Q.   Let me make this a little bigger for us.
17 Okay.  And here we're -- it says at -- I'm guessing
18 approximately 2:15 p.m.  And then the whole rest of the
19 line is redacted, again.  The name of the inmate was
20 utilizing to block something following the something
21 inmate something, and then that whole line except the
22 word inmate is redacted.
23        Here's something.  We have a name.  I guess
24 redaction isn't 100 percent always, huh?
25   A.   It can be difficult to ensure that all of the

1    identities are captured when you're redacting a scanned

2    document.

3        Q.    Okay.  Well, possibly we might have, since

4    that's an unusual name, we might have an answer to our

5    dilemma here that we need to get an unredacted copy.

6    But if it's not an active criminal investigation and if

7    Chisolm isn't shown to be the victim of a crime, that it

8    would be fair to say that the document should be

9    unredacted?

10       A.    It could be somewhat fair as long as that the

11   inmate, that they did redact the name.  They didn't see

12   that the -- there would be information that would

13   jeopardize that inmate's safety if there's further

14   documentation stating that that inmate was a victim of

15   or alleged victim of sexual assault or sexual abuse.

16       Q.    No.  Don't see anything like that suggested

17   here.  But we have got tons of redaction in this guy's

18   file.  Haven't seen that anywhere else.

19             Here again, I guess you pretty much told us

20   that as far as the use of force logs are concerned, that

21   maybe you're not the one to address the reasons for the

22   redactions?  But here --

23       A.    It's --

24       Q.    Go ahead?

25       A.    It's just hard to say what could be under

1  that --

2        Q.   Mm-hmm.

3        A.   -- under those redactions.  If the use of

4  force log, you know, if the use of force log was, you

5  know, an attachment in an IG investigation, it is

6  something that we would review and redact.  And I do not

7  think that we would need guidance on redacting in

8  something like that.

9        Q.   Mm-hmm.

10       A.   But it's -- it is hard to say without knowing

11  what's under that redaction of what --

12       Q.   Okay.

13       A.   -- could possibly be the reason.

14       Q.   Here again we have an inmate's name redacted.

15  (Indicating.)  And here again we have an inmate's name

16  redacted.  And here again we have an inmate's name

17  redacted.  And I guess here again we have an inmate's

18  name redacted.  Is there anything other than being the

19  subject of an investigation that you can think of, that

20  would justify redacting those names?

21       A.   No, sir.

22       Q.   Even from public records?

23       A.   No, sir.

24       Q.   Okay.  Let me go on to the next.  A lot of

25  these things are going to be very similar.  The only

1   merciful thing is that some of them are much shorter

2   than that one.  So let's see.  I think we might have had

3   some additional situations where, yeah, non-relatives

4   who now you are redacting, and you think that might

5   be -- let me see.  Actually this doesn't even say that

6   they're in his neighborhood so it wouldn't necessarily

7   say where he lives.  Any other reasons you can think of

8   to redact their addresses and phone numbers?

9       A.   No.  Not off the top of my head, no.

10      Q.   Okay.  Let's see what else we have got here.

11  Oh, this is interesting.  We have got some use of force

12  logs where the person on whom force was used is not even

13  written in?

14      A.   Mm-hmm.

15      Q.   Here it is.  (Indicating.)  Okay.  I'm

16  assuming that's the name.  But again your -- your

17  concern would be an active investigation or what was the

18  other thing?

19      A.   Any active investigation and, um, I think, I

20  think that's it.

21      Q.   Okay.

22      A.   I have noticed, looking at these use of force

23  logs, that I see physical and reactionary.  I don't see

24  chemical.

25      Q.   Yeah.  I know we have got some.  And I think

33

1    there was, actually, in the one that was so heavily

2    redacted, I think that was a chemical or something

3    that's spontaneous and then something is redacted.

4         A.   Based on the unredacted information, I would

5    presume that that may say chemical underneath that

6    redaction.

7         Q.   Yeah.  I see there's spontaneous and PHI for

8    physical, obviously.

9         A.   Mm-hmm.

10        Q.   So I would guess you're probably right.  Yeah,

11   there's a spontaneous physical.  Okay.  I'm going to try

12   to get through these as quick as I can.  Okay.  Yeah,

13   here's some more.  Now, these are neighbors.

14        A.   Mm-hmm.

15        Q.   So I got that.  Now, here is something.  I'm

16   guessing this is probably, would this be likely a

17   photograph?

18        A.   Yes.

19        Q.   Okay.  Can you think of any reason why

20   photographs would be redacted in a discovery request?

21        A.   Only pursuant to the exemption in Chapter 119.

22        Q.   Okay.  And that's the only reason that you can

23   think of?

24        A.   Yes.

25        Q.   Okay.  Some of these things you can kind of

1    piece together without seeing every word.

2              Now, here's something where this position says

3    physical and these may be chemical?

4        A.    That or there could be some health

5    information --

6        Q.    Okay.

7        A.    -- under, under those redactions.

8        Q.    Okay.  I didn't see any health information

9    anywhere else, but, um, hmm.

10        A.    Such as an inmate declaring a psychological

11    emergency.

12        Q.    Mm-hmm.

13        A.    Requesting to see medical.

14        Q.    So that might be redacted as PHI?

15        A.    Yes.

16        Q.    I see.  Okay.  Now, here, this looks like it

17    might be a complete and total birth certificate.  I know

18    that there are some things in a birth certificate that

19    wouldn't be public information, but why would the whole

20    thing be blacked out like that?  Convenience?

21        A.    I -- I'm not sure.  I would agree that certain

22    information of the certificate would be redacted.

23        Q.    Mm-hmm.  Okay.  Here is an example where

24    they're redacting a particular wing and something that

25    is -- comes before security check.  Can you think of any

35

1  reason to be redacting locations like that and --

2       A.    Yes.

3       Q.    What is it?

4       A.    I would say that the security, the

5  surveillance techniques of identifying a -- where a

6  fixed wing video is located.

7       Q.    Okay.

8       A.    On which letter wing.  And it appears that the

9  second redaction is related to security information as

10  well.  Maybe referring to the certain times the inmates,

11  they're required to conduct a security check.

12       Q.    Okay.  Or maybe, maybe they're just redacting

13  something like master count or something that tells

14  when, well, I guess it doesn't really tell you what time

15  it was anyway.  But, anyway, so that would be an

16  application of a public records law, is that your take

17  on this?

18       A.    Yes.

19       Q.    Okay.  (Pause.)

20            Well, here's some more physical and blank.

21  (Indicating.)  And let's see, I guess I should be saying

22  what pages these are.  These are the merit file, page 35

23  of 38.  And it looks like here again we've got a blank

24  wing, required blank security check.  Again, would you

25  say that is an application of public records law?

1        A.    I would, yes.

2        Q.    Okay.  So whatever these things are, they are

3   other than physical?

4        A.    That's what it appears to be if they're -- if

5   they're maintaining consistency through the redactions.

6        Q.    Mm-hmm.  Okay.  We're almost done.  You've

7   answered my questions about the MINS so I won't belabor

8   that.  Here's another neighbors redaction.  Let's see.

9             Okay.  This appears to relate to a time

10  approximately something p.m. or a.m.  Going into

11  something recount.  Cleared at something a.m. or p.m.

12  Does this appear again to be a public records law

13  redaction?

14       A.    Yes, it appears to be security exemption that

15  were applied which would be public records law.

16       Q.    Okay.  Again times, it appears.  Do you think

17  it would be helpful for us to more clearly set out, in a

18  request to the redactor, what the basis of the request

19  is and what the protections are?

20       A.    The protections as far as what agreements are

21  in place --

22       Q.    Yeah, what were --

23       A.    -- that would not be disclosed outside of the

24  litigation?

25       Q.    Right.

1      A.   Yes.

2      Q.   Okay.  Because we end up with an agreement

3  that is pretty specific on what we're agreeing to do

4  with the information.  And I -- I'm not sure that's

5  always getting to the legal advisors or to the people at

6  the -- in the General Counsel's office because I can't

7  imagine why they would want to keep this information

8  from us.  Time and place information.

9           Here's another heavily redacted.  I'm trying

10 to find the thing that was obvious to me that involved

11 application of chemical agents.  No, that's not it.

12 We're almost done.

13     A.   Okay.

14     Q.   Here's something that looks like it has to do

15 with the number of inmates recorded at count.  The count

16 was not clear having blank inmate under the

17 institutional count of blank inmates at approximately --

18 Here's a time, announced recount that was still blank

19 inmate under the institutional count of blank inmates.

20          It sounds like they had a count discrepancy.

21 Any idea why they would be redacting the number of

22 inmates in a count that happened, I guess, now five

23 years ago?

24     A.   My best guess again would be the number of

25 inmates, again, a security exemption as to the number of

1  inmates that are within the dormitory, and the number of

2  officers that may be supervising that number of inmates.

3       Q.   Right, but, you mean to say reveal how

4  understaffed they are?

5            THE WITNESS:  I wouldn't --

6            MS. DURHAM:  Object to form.

7            THE WITNESS:  No, I would not say that.  I

8       would simply say just who, the number of inmates

9       that an officer supervises and how that could

10      possibly jeopardize the safety of an institution.

11 BY MR. COOK:

12      Q.   Even if it's five years ago?

13      A.   Yes, because there is consistency among

14 security.

15      Q.   Well, I don't know.  I mean I've looked

16 through a lot of records and I've never seen a

17 (inaudible) one before.

18      A.   It's rare that I run across information in a

19 count, of a count.  I don't know if that's in the use of

20 force file.

21      Q.   Okay.  But, in any case, that's more of a

22 public records request type redaction, isn't it?

23      A.   I would lean more that it's public a records

24 regarding security.  However, I do wonder that they

25 worry about jeopardizing the safety of the institution,

OR THE RECORD REPORTING TALLAHASSEE FLORIDA  850.222.5491

1  of individuals at the institution.

2        Q.   Yeah, like we worry about the safety of our

3  clients.

4        A.   Yes.  The clients and the inmates.

5        Q.   Of course, our clients are inmates.

6        A.   The staff members and the inmates then.  My

7  apologies.

8        Q.   That's all right.  Let's see.

9             MS. DURHAM:  Mr. Cook, I'm sorry, I have

10        another deposition at two.

11  BY MR. COOK:

12        Q.   Okay.  Yeah.  Like I say, we're just about

13  finished.  Mr. Porr was so active in his career that

14  he's making it a little bit challenging for us.  Even

15  now that his career is over.

16             Okay.  I think we have touched on just about

17  every example that I can think of.  I still don't have a

18  real clear, you know, this is chemical agents as opposed

19  to something else, but maybe there's another way of

20  getting at that.  Let's see.  That's Porr.  See what

21  Rogers looks like.

22             This is the last one.  We have already got the

23  information we wanted on the MINS finally.  Thank you

24  very much.  And this is just -- yeah, okay.  I think, I

25  think I understand what the -- what the redactions are

40

1   about primarily, and I thank you for lending your

2   insight and experience toward that end.

3        A.    Absolutely.

4              MR. COOK:  Okay.  So, Ms. Durham, we don't

5        have anybody else this afternoon, and you want to

6        do the read or waive thing?

7              MS. DURHAM:  Yes.  Have you given a deposition

8        before?

9              THE WITNESS:  Yes, ma'am.

10             MS. DURHAM:  You know you can read or waive

11       your testimony, read over your testimony or waive

12       reading of it to make sure that your testimony was

13       correct or taken down correct, correctly.  Would

14       you like to read or waive?

15             THE WITNESS:  I will waive.

16             MS. DURHAM:  Okay.  Then that's it.

17             MR. COOK:  Okay.  Well, thank you, Ms. Seck,

18       very much for your time and I'm sorry for the

19       delay.

20             THE WITNESS:  That's okay.

21             MR. COOK:  And I appreciate your patience and

22       your answers.

23             (Whereupon, the deposition was concluded at

24   approximately 1:43 p.m.)

25

41

1                 CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA      )

4    COUNTY OF LEON        )

5

6             I, DEBORAH ALFF, do hereby certify that I was

7    authorized to and did stenographically report the

8    deposition of KRISTINA SECK; that a review of the

9    transcript WAS NOT requested; and that the transcript,

10   pages 1 through 41, contains a true record of my

11   stenographic notes and recordings thereof.

12            I FURTHER CERTIFY that I am not a relative,

13   employee, or attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action, nor am I

16   financially interested in the action.

17

18            DATED this 27th day of March, 2022, at

19   Tallahassee, Leon County, Florida.

20

21

22

23   _____

24                DEBORAH ALFF, RPR

25